UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

PARIS DERON PALMER,

               Petitioner,

v.

CARMEN PALMER,

               Respondent.

_____/

Case No. 1:15-cv-458

Honorable Gordon J. Quist

## **REPORT AND RECOMMENDATION**

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Paris Deron Palmer is incarcerated with the Michigan Department of Corrections at the Carson City Correctional Facility in Carson City, Michigan.  Following a jury trial in the Calhoun County Circuit Court, Petitioner was convicted of first-degree murder, Mich. Comp. Laws § 750.316, under two theories: premeditated killing and felony murder.  The jury also found Petitioner guilty of armed robbery, Mich. Comp. Laws § 750.529, unlawful imprisonment, Mich. Comp. Laws § 750.349b, and three counts of felony firearm, Mich. Comp. Laws § 750.227b.  On April 12, 2010, the court sentenced Petitioner to the following prison terms: life without parole, for the murder conviction; 30 to 50 years for the armed robbery conviction; and 9 years, 6 months to 15 years for the unlawful imprisonment conviction, all consecutive to three concurrent 2-year sentences for the felony firearm convictions.

On April 7, 2015, Petitioner timely filed his initial habeas corpus petition. (ECF No. 1.)  Petitioner filed his first amended petition on June 8, 2015.  (ECF No. 8.)  Shortly thereafter, Petitioner asked the Court to hold this action in abeyance so that he might return to the

state trial court to seek relief from the judgment based on new evidence.  (Pet'r's Mot., ECF No. 12.)  By order entered November 19, 2015, the Court granted Petitioner's motion.  (ECF No. 16.)

On January 30, 2017, Petitioner returned to this Court and filed his second amended petition which raises eleven grounds for relief, as follows:

I.     The Michigan courts unreasonably applied law in finding no violation of Petitioner['s] due process right during his rebuttal closing argument that it was obvious that Petitioner had dealt with alleged drug dealer Oscar Romano prior to the day of the shooting where there was no evidence to support this claim.

II.    The state courts unreasonably applied federal law in affirming Petitioner's first-degree murder conviction (under two theories, premeditated or felony murder) where there was insufficient evidence to support the underlying felony of armed robbery; the prosecutor only established destruction of the cell phones and not the larcenous taking of them, and failed to prove beyond a reasonable doubt the element of premeditation where the shooting occurred during the course of a heated argument.

III.   Petitioner's in court identification at the preliminary examination and trial violated his right to due process and a fair trial.

IV.    Petitioner was denied his right to a fair trial by an impartial jury in violation of this 6th Amendment when the trial court failed to sua sponte remove a juror for cause, and when the prosecutor gave the jury [an] inappropriate reasonable doubt standard.

V.     Petitioner was denied his due process right to a properly instructed jury and a fair trial where the trial court erroneously instructed the jury on the prosecutor's theory, resulting in Petitioner being convicted of felony and first[-]degree murder.

VI.    Petitioner is entitled to habeas relief where the trial judge failed to instruct the jury on the requested manslaughter charge.

VII.   The Petitioner is entitled to habeas relief where the prosecutor-(a) used a co-defendant's plea agreement to bolster his credibility; (b) failed to correct perjured testimony; and (c) misstated the law as to the reasonable doubt standard of proof during voir dire, resulting in a denial of the right to a fair trial.

VIII.   Petitioner was denied the 6th Amendment right to effective counsel due to numerous substantial errors which deprived Petitioner of a fair trial.

IX.   Petitioner was denied the effective assistance of Appellate counsel on his appeal, as of right, contrary to the 14th Amendment, entitling him to habeas relief.

X.   Petitioner was denied his 6th Amendment rights to effective counsel due to an actual conflict of interest and his right to counsel of choice, thus, habeas relief is required.

XI.   Petitioner was denied his right to effective counsel due to a conflict of interest and his right to counsel of choice, where trial counsel committed extrinsic fraud, thus, habeas relief is required.

(Pet., ECF No. 24, PageID.226-241; ECF No. 24-2, PageID.250-256.)  Respondent has filed an answer to the petition (ECF No. 32) stating that the grounds should be denied because they without merit or procedurally defaulted.  Upon review and applying the standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), I find that the grounds are without merit.  Accordingly, I recommend that the petition be denied.

## Discussion

I.    Factual Allegations

On July 14, 2009, Oscar Romano was shot through the head at point blank range. There is not any meaningful dispute about who pulled the trigger.  Petitioner did.  The challenges raised by Petitioner center on whether the killing was premeditated and whether it was part of an

3

armed robbery.  There were five other people in the immediate vicinity when the gun was fired. There were also some neighbors who heard the shot and/or saw Romano go down.

Romano was with his girlfriend Lisa Clark, and his friends Jawara Triggs and Fred Dimas at the time of the shooting.[1]  The four were confronted by three armed men—Petitioner, Vernon Turman, and Leroy Glenn—at  Romano's home at 145 Magnolia Street in Battle Creek, Michigan.  Earlier that day Petitioner had purchased some marijuana from Romano.  Petitioner had paid Romano a sum of money and expected to receive additional drugs.  Romano had not delivered.  Petitioner demanded that Romano give Petitioner his money back or the drugs.

When confronted with the guns, Romano put Petitioner off by claiming they would have to travel to a different location to provide Petitioner what he wanted.  Petitioner hit Romano in the head with his gun.  He brought Romano in the house and directed Turman and Glenn to bring the others.  He directed Turman and Glen to go through the pockets of their captives.  They took cell phones and destroyed at least one.  Eventually, Petitioner brought Romano back outside and directed Turman and Glenn to bring the others.  Petitioner walked with Romano down the driveway.  They argued.  Petitioner put his gun to Romano's head and pulled the trigger.  The gunmen fled.

Petitioner, Turman, and Glenn ran to Petitioner's Buick.  They drove onto the Interstate 94.  An officer saw them and pursued.  The resulting high-speed chase resulted in the Buick overturning.

---

[1] Lisa Clark, Jawara Triggs, Fred Dimas, and Leroy Glenn testified at Petitioner's trial.  (Dimas, Trial Tr. III, ECF No. 33-6, PageID.830-840, 850-864; Clark, Trial Tr. IV, ECF No. 33-7, PageID.865-890; Triggs, Trial Tr. IV, ECF No. 33-7, PageID.895-919; Glenn, Trial Tr. V, Page ID.964-993.)  This statement of facts is derived from the testimony of those four witnesses, the only witnesses to the events at 145 Magnolia leading up to and including the shooting.

The three were arrested.  Glenn entered a plea of *nolo contendere* to a charge of second-degree murder.  He testified at Petitioner's trial.  He negotiated a minimum sentence of 15 years as part of his plea.  Turman entered a plea of *nolo contendere* to second-degree murder and felony firearm.  He did not testify at Petitioner's trial.  Turman received a minimum sentence of 19 years consecutive to a 2-year sentence for felony firearm.

The jury deliberated for about four hours before returning the verdicts.

Petitioner, with the assistance of counsel, appealed his convictions.  Petitioner raised three issues, those three issues have been consolidated to two in the petition: Habeas Issues I and II.  (Pet'r's Br. on Appeal, ECF No. 33-12, PageID.1059.)  By *per curiam* opinion issued March 6, 2012, the Michigan Court of Appeals affirmed the trial court.  (Mich. Ct. App. Op., ECF No. 33-12, PageID.1049-1052.)

Petitioner, again with the assistance of counsel, filed an application for leave to appeal in the Michigan Supreme Court, raising the same issues he had raised in the court of appeals.  (Pet'r's Appl. for Leave to Appeal, ECF No. 33-13, PageID.1142.)  The supreme court denied leave by order entered July 24, 2012.  (Mich. Order, ECF No. 33-13, PageID.1140.)

Petitioner then filed a motion for relief from judgment in the trial court.  (Pet'r's Mot. for Relief from J., ECF No. 33-14.)  Petitioner raised seven issues in his motion, the issues identified as Habeas Issues III-IX above.  (*Id.*, PageID.1237-1239.)  The trial court denied Petitioner's motion by order entered June 5, 2013.  (Calhoun Cty. Cir. Ct. Order, ECF No. 33-16.)  The court, in a one-page order, concluded the issues were meritless and appellate counsel was not ineffective for failing to raise them on Petitioner's direct appeal.  (*Id.*)  Petitioner applied for leave to appeal in the Michigan Court of Appeals and the Michigan Supreme Court raising the same

seven issues.  Those courts denied leave by orders entered June 2, 2014, and March 3, 2015, respectively.  (Mich. Ct. App. Order, ECF No. 33-17, PageID.1544; Mich. Ord., ECF No. 33-18, PageID.1785.)

Petitioner then filed his initial petition in this Court.  While this action was held in abeyance, by way of a successive motion for relief from judgment, Petitioner raised two new issues in the trial court, the issues identified above as Habeas Issues X and XI.  (Pet'r's Second Mot. for Relief from J., ECF No. 33-19, PageID.1970.)  The trial court denied Petitioner's motion initially (Calhoun Cty. Cir. Ct. Order, ECF No. 33-21), and upon reconsideration (Calhoun Cty Cir. Ct. Order, ECF No. 33-23).  Petitioner sought leave to appeal the circuit court's denial of his motion in the Michigan Court of Appeals and the Michigan Supreme Court.  Those courts denied leave by orders entered June 6, 2016, and January 5, 2017, respectively.  (Mich. Ct. App. Ord., ECF No. 33-24, PageID.2014; Mich. Order, ECF No. 33-25, PageID.2085.)

Petitioner, having fully exhausted his state court remedies, presents his eleven issues for consideration by this Court.

II.    AEDPA Standard

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established

6

federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Williams*, 529 U.S. at 381-382; *Miller v. Straub*, 299 F.3d 570, 578-79 (6th Cir. 2002).  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 565 U.S. 34 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  *Woods*,

135 S. Ct at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims."  *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

III.  <u>Sufficiency of the Evidence (Habeas Issues II and III)</u>

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Id.*  Issues of credibility may not be reviewed by the habeas court under this standard.  *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993).  Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific

reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case:  First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008). This standard erects "'a nearly insurmountable hurdle'" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Davis v. Lafler*, 658 F.3d 525, 534 (6th Cir. 2008) (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

Petitioner attempts to overcome the nearly insurmountable hurdle with respect to two elements in the crimes of which he was convicted.  First, with respect to Petitioner's convictions for felony murder and the predicate felony of armed robbery, Petitioner contends the prosecutor failed to show the necessary intent in the taking (and destroying) of one or more cellphones.  The Michigan Court of Appeals concluded that the prosecutor had presented sufficient evidence to support the intent element:

> Defendant argues that there was insufficient evidence that an armed robbery was committed and that, accordingly, his convictions of armed robbery and felony murder, which relied on the presence of an armed robbery, must be vacated.  We disagree.
>
> Felony murder has three elements:

> (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing . . . or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316(1)(b). [*People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009).]

Defendant only challenges the sufficiency of the evidence on this count with regard to the third element. Specifically, defendant was convicted of felony murder for his role in the armed robbery. Hence, defendant's position is that if there was insufficient evidence to support an armed robbery, then his conviction for felony murder would not [be] supported. As a result, we will focus our analysis on whether there was sufficient evidence to support finding that an armed robbery took place.

Armed robbery, MCL 750.529, consists of a larceny by force, while the perpetrator possessed a dangerous weapon. *People v Chambers*, 277 Mich App 1, 7; 742 NW2d 610 (2007). Larceny is the trespassory taking and carrying away of the property of another with felonious intent. *People v Cain*, 238 Mich App 95, 120; 605 NW2d 28 (1999). Felonious intent is the intent to permanently deprive the victim of his property. *People v Perkins*, 262 Mich App 267, 271-272; 686 NW2d 237 (2004). "[M]inimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented." *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008).

Although defendant did not personally take a cellular telephone, his conviction for armed robbery was based on an aiding and abetting theory. Aiding and abetting has three elements: (1) the defendant or someone else committed the crime; (2) the defendant performed acts, encouraged, or assisted in the commission of the crime; and (3) "the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement." *People v Plunkett*, 485 Mich 50, 61; 780 NW2d 280 (2010) (internal quotations omitted).

When viewed in a light most favorable to the prosecution, sufficient evidence was introduced to allow a rational jury to conclude beyond a reasonable doubt that defendant aided in permanently depriving Dimas of his cellular telephone. First, the crime of armed robbery was committed. Defendant, Glenn, and Turman held Romano, Jawara Triggs, Lisa Clark, and Frederick Dimas at gunpoint. Defendant told Turman to check Dimas's pocket for a cellular telephone. Defendant asked Dimas whether he had a cellular telephone, and Dimas replied that he did not. Turman nevertheless reached into Dimas's pocket and took his white cellular telephone. Dimas has never recovered his cellular telephone. In fact, Glenn testified that he later saw a white cellular telephone in defendant's car after they left Romano's home. Minimal circumstantial evidence will suffice to prove intent.

10

*Kanaan*, 278 Mich App at 622.  Taking a cellular telephone by force and keeping it permanently supports a reasonable inference that Turman intended to permanently deprive Dimas of his cellular telephone.  *Cain*, 238 Mich App at 120.  Second, defendant encouraged or assisted in the commission of the crime and intended its commission.  Defendant asked Turman to check Dimas's pocket for a cellular telephone.  This shows he encouraged the crime and supports a reasonable inference that he intended to permanently deprive Dimas of his cellular telephone.  *Id*.  There was sufficient evidence to prove beyond a reasonable doubt that Turman committed an armed robbery and that defendant aided in that armed robbery.  *Wolfe*, 440 Mich at 515.  Sufficient evidence, thus, supported defendant's armed robbery conviction and, consequently, his felony murder conviction.

Defendant contends that there was insufficient evidence to establish that he had the requisite intent to support his conviction for armed robbery, even as an aider or abettor.  The evidence was that after Glenn took Romano's and Triggs's cellular telephones, one of the codefendants said to "smash" the telephones.  Glenn subsequently smashed Romano's and Triggs's cellular telephones.  Defendant argues that this shows the only intent was to destroy the cell phones, and that there was insufficient evidence of an intention to steal them.  However, the felonious intent must be present at the time of the taking.  *Cain*, 238 Mich App at 118-119.  The statement or command to "smash" the telephones was (1) not attributed to defendant, and (2) was made after the phones were taken.  Thus, we hold that a jury could have reasonably inferred that defendant possessed the requisite felonious intent at the time of the taking.  As a result, we need not address whether an intent to destroy property satisfies the intent to steal that property for purposes of a larceny.

(Mich. Ct. App. Op., ECF No. 33-12, PageID.1050-1051.)

Although the Michigan Court of Appeals does not cite *Jackson v. Virginia*, the court's analysis is entirely consistent with that clearly established federal law.  The court analyzed the evidence in a light most favorable to the prosecution with specific reference to the elements of the crime as established by state law.

Petitioner does not take issue with the facts the Michigan Court of Appeals identified as supportive of the jury's determination that Petitioner had aided and abetted armed robbery and, thus, committed felony murder.  Rather, Petitioner asks the Court to conclude from the fact that Glenn smashed two cell phones, possibly at Petitioner's direction, that there was never

a larcenous intention in the first instance.  Even if that were true with respect to the smashed phones,[2] it does not change the permissible inference of Petitioner's intent to permanently deprive Dimas with respect to Dimas's phone.

The factual determinations of the Michigan Court of Appeals are reasonable on the record.  Indeed, Petitioner does not take issue with them.  Petitioner does take issue with the court of appeals' determination regarding the sufficiency of the evidence of his intent; however, he has failed to show that the intent determination is contrary to, or an unreasonable application of *Jackson*.  Accordingly, Petitioner is not entitled to habeas relief on this claim.

Petitioner's second attack on the sufficiency of the evidence is effectively mooted by the resolution of his first.  If there is sufficient evidence to support Petitioner's felony-murder conviction, his first-degree murder conviction stands even if there is not sufficient evidence with regard to premeditation.  Nonetheless, in the alternative, the state appellate court's determination that Petitioner's premeditated murder conviction is supported by sufficient evidence is also entirely consistent with clearly established federal law.

---

[2] Although the Michigan Court of Appeals in Petitioner's case avoided the question of whether taking another's personal property to destroy it is larcenous, the plain language of the elements suggests that it would be.  Destruction of goods is is no less effective a means of permanently depriving a person of their property than is taking and keeping it.  *See, e.g., People v. Brown*, No. 298656, 2011 WL 6267314, at *1 (Mich. Ct. App. Dec. 15, 2011) ("The victim testified that defendant forcefully took her cellular telephone and exited the vehicle with it.  The telephone was found, broken in two pieces, a block away. . . . When viewed in a light most favorable to the prosecution, the forceful method by which defendant acquired the victim's cellular telephone, the subsequent location of the telephone, and the condition of the telephone is circumstantial evidence that would permit a rational jury to find that the requisite intent was proved beyond a reasonable doubt.").  Moreover, Petitioner's implicit claim that movement of the phones from the possession of the victims to the floor is insufficient to satisfy the asportation element is not well taken.  The Michigan courts have held that the "slightest movement of goods" may satisfy the "carrying away" element of larceny.  *See, e.g., People v. Dodge*, No. 307983, 2012 WL 6217048 (Mich. Ct. App. Dec. 13, 2012); *People v. Hawkins*, No. 219689, 2001 WL 703955 (Mich. Ct. App. Mar. 23, 2001); *People v. Zapawa*, No. 206496, 1999 WL 33438023 (Mich. Ct. App. Aug. 6, 1999).  Therefore, even with respect to the destroyed phones, the evidence introduced permits the necessary inference regarding Petitioner's intent.

12

There is ample testimony that Petitioner and his colleagues purposely targeted Romano to obtain the drugs Romano had agreed to provide or the return of the money Petitioner paid for those drugs.  There is testimony that Petitioner said to "get the fat one" (Romano) and to "kill them all."  The testimony discloses that Petitioner put the gun to Romano's head and walked him down the driveway and pulled the trigger.  Those facts permit an inference of premeditation and, thus, support a determination that Petitioner was guilty of first-degree murder.

Certainly, one might look at those facts, and others as urged by Petitioner, and infer that it was not premeditated.  But, the *Jackson* sufficiency analysis does not call upon the Court to view the facts in a way that favors Petitioner.  Viewed in a light that favors the prosecution, there was testimony in the record from which the jury might infer that Petitioner's killing of Romano was premeditated.  Accordingly, Petitioner has failed to show that the Michigan Court of Appeals' conclusion regarding sufficiency is contrary to, or an unreasonable application of, clearly established federal law.

IV.    Procedural Default

Petitioner raised Habeas Issues III-IX for the first time in his first motion for relief from judgment.  The trial court refused to consider any of the issues Petitioner raised in that motion because he had failed to raise them on his direct appeal and had failed to establish either good cause for that failure or resulting prejudice. [3] (Calhoun Cty. Cir. Ct. Op. & Order, ECF No. 33-16,

---

[3] Petitioner raised Habeas Issues X and XI for the first time in his second motion for relief from judgment.  (Pet'r's Second Mot. for Relief from J., ECF No. 33-19.)  The trial court considered the issues on the merits, but denied relief. (Calhoun Cty. Cir. Ct. Order, ECF No. 33-21.)  Thus, the doctrine of procedural default is not implicated with respect to Habeas Issues I and II, which were raised on direct appeal and resolved on the merits, or Habeas Issues X and XI, which were not raised on direct appeal, but were considered on the merits rather than on the basis of a procedural default.

13

PageID.1543.)  The court rejected Petitioner's claims under Michigan Court Rule 6.508(D)(3). (*Id.*)

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the state court enforced the rule so as to bar the claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).  In determining whether a state procedural rule was applied to bar a claim, a reviewing court looks to the last reasoned state-court decision disposing of the claim. *See Ylst*, 501 U.S. at 803; *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010).  Here, the last reasoned state-court decision is the trial court's opinion and order resolving Petitioner's motion for relief from judgment.

There is no question that Petitioner failed to comply with the requirement to raise his post-judgment motion issues in the Michigan Court of Appeals on direct appellate review; thus, he failed to follow the state procedural rule.  The state court expressly relied upon Petitioner's default in denying his claim.  It is also beyond dispute that the procedural rule is an adequate and independent ground for denying relief.  A rule is an adequate and independent ground when it was "firmly established and regularly followed" at the time of the asserted procedural default. *Rogers*

14

v. *Howes*, 144 F.3d 990, 992 (6th Cir. 1998) (citing *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)). Mich. Ct. Rule 6.508(D)(3) "was firmly established and regularly followed . . . and was an adequate and independent state ground for denying review." *Gates v. Hoffner*, No. 17-2198, 2018 WL 1614261, at *2 (6th Cir. Mar. 23, 2018) (citing *Simpson v. Johnson*, 238 F.3d 399, 407 (6th Cir. 2000)).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). Petitioner may contend he is actually innocent; however, he does not offer any new reliable evidence to support his claim. Indeed, the focus of his arguments does not appear to be that he is innocent, but that he is guilty of a lesser crime. Accordingly, to avoid the procedural default bar, Petitioner must show cause for his default and resulting prejudice, coincidentally the same showing he was required to make under Michigan Court Rule 6.508(D)(3) to convince the state trial court to consider his claims.

Petitioner offers as cause here the same cause he offered in the state trial court: the ineffective assistance of his appellate counsel.  In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

In evaluating the effectiveness of Petitioner's appellate counsel, the state trial court looked to the merits of Petitioner's defaulted claims, concluded they were without merit, and found it was not unreasonable for appellate counsel to forego such frivolous claims.  To evaluate whether the trial court's determinations are factually reasonable on the record and legally reasonable applications of *Strickland*, this Court must examine, at least to some extent, the merits of those claims.  Under the circumstances, simply addressing the merits at the outset appears to be simpler.

16

The United States Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)). *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.")).  Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Hudson*, 351 F.3d at 215-16; *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

V.    The Pretrial Photographic Lineups and In-court Identifications of Petitioner Violated Due Process (Habeas Issue III)

Clark, Triggs, and Dimas, at trial, all identified Petitioner as the person who shot Romano.  They also identified Petitioner as the shooter at the preliminary examination.  The day after the incident, the police attempted to pull together physical lineups to determine if the victims could identify the gunmen.  (Police Report, ECF No. 33-17, PageID.1780-1782.)  The police were unable to pull together enough black males with similar characteristics to conduct physical lineups.  (*Id.*)  Instead, Deputy Fireson compiled photo lineups.  (*Id.*)  Clark was unable to pick Petitioner out of the photo lineup.  (*Id.*)  Triggs was unable to pick Petitioner out of the photo lineup.  (*Id.*)

17

Dimas looked at the photo lineup that included Petitioner and said it was either Petitioner, at position 5, or the individual at position 7.  (*Id*.)

The trial court rejected Petitioner's identification challenge as meritless.  As a matter of federal constitutional law, Petitioner has failed to demonstrate that the identifications were so impermissibly suggestive that they violated the Due Process Clause.  There can be little question that victims' identifications of Petitioner at the preliminary examination, and then the trial, were the product of suggestive circumstances.  The Supreme Court has expressly stated that such identifications are "suggestive."  *See Perry v. New Hampshire*, 565 U.S. 228, 244 (2012) ("Most eyewitness identifications involve some element of suggestion. Indeed, all in-court identifications do.").  But the fact that an identification procedure is suggestive does not, standing alone, implicate due process protections.  Rather, there must be "improper law enforcement activity" before a suggestive identification requires further scrutiny.  *Id*. at 232-33.  Because the *Perry* Court used in-court identifications as examples of suggestive identifications that do not implicate due process protections and Petitioner offers no evidence of "improper law enforcement activity" in connection with the identifications at the preliminary examination and trial here, Petitioner cannot show that the rejection of his claims is contrary to or an unreasonable application of clearly established federal law.

Petitioner's claim that the photo lineup violated his due process rights is also without merit.  In determining whether a photo lineup presents an unacceptable risk of misidentification, courts employ a two-step analysis.  *Haliym v. Mitchell*, 492 F.3d 680, 704 (6th Cir. 2007) (quoting *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967), and citing *Neil v. Biggers*, 409 U.S. 188, 197 (1972)).  The first step requires a determination as to whether the identification

was "unnecessarily suggestive." *Id.*  To make this determination, "the court may consider 'the size of the [photographic] array, the manner of its presentation by the officers, and the details of the photographs themselves.'"  *United States v. McComb*, 249 F. App'x 429, 437 (6th Cir. 2007) (citing *United States v. Sanchez*, 24 F.3d 1259 (10th Cir. 1994)); *see also United States v. Wade*, 388 U.S. 218 (1967).  The second step of the inquiry requires consideration of a number of factors:

> The factors considered in making this determination include: "1) the witness's opportunity to view the criminal at the time of the crime; 2) the witness's degree of attention; 3) the accuracy of the witness's prior description of the criminal; 4) the level of certainty demonstrated at the confrontation; and 5) the time between the crime and the confrontation."

*McComb*, 249 F. App'x at 437 (citing *United States v. Beverly*, 369 F.3d 516 (6th Cir. 2004)); *see also Haliym*, 492 F.3d at 704 (citing *Brathwaite*, 432 U.S. at 114, and *Biggers*, 409 U.S. at 199-200.  If "the first step of the requisite analysis ends in the government's favor, [the court] need not address" the second step of the inquiry.  *United States v. Stamper*, 91 F. App'x 445, 462 (6th Cir. 2004).

Petitioner's challenge falters at the first step.  Two of the three witnesses were not able to pick Petitioner out of the photo lineup.  The third was only able to narrow the field down to two persons.  If the police tried to create a suggestive photo lineup here, they did not do a very good job of it.  The results of the photo lineup belie Petitioner's claim that the lineup was unduly suggestive.

Finally, Petitioner contends the photo lineup violated his rights because his counsel was not present.  The Constitution does not require the presence of counsel at a photographic lineup.  The Sixth Amendment provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend

VI.  The right to counsel exists at all so-called "critical stages" of the trial process, that is, "at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected." *Mempa v. Ray*, 389 U.S. 128, 134 (1967).  As a general matter, once criminal proceedings have begun a corporeal line-up is such a "critical stage" of the proceedings to which the right of counsel attaches. *See Gilbert v. California*, 388 U.S. 263, 272 (1967); *Wade*, 388 U.S. st 218.  In *United States v. Ash*, 413 U.S. 300 (1973), however, the Court expressly distinguished between photographic and corporeal line-ups, and declined to extend the Sixth Amendment right of counsel to photographic line-ups, holding that "the Sixth Amendment does not grant the right to counsel at photographic displays conducted by the Government for the purpose of allowing a witness to attempt an identification of the offender." *Id*. at 321; *see also Moore v. Illinois*, 434 U.S. 220, 227 n.3 (1977).  Thus, Petitioner had no federal constitutional right to counsel at the photographic line-up and he is not entitled to habeas relief based on counsel's absence.

VI.    Biased Juror (Part of Habeas Issue IV)

Petitioner argues that he was denied a fair and impartial jury.  The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury. . . ." U.S. Const. amend. VI.  The right to an impartial jury is applicable to the states via the Fourteenth Amendment.  *See Turner v. Louisiana*, 379 U.S. 466, 471-72 (1965); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  Further, "due process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Morgan v. Illinois*, 504 U.S. 719, 727 (1992) (citations omitted).  "The *voir dire* is designed "'to protect [this] right by exposing possible biases, both known and

20

unknown, on the part of potential jurors.'" *Dennis v. Mitchell*, 354 F.3d 511, 520 (6th Cir. 2003)

(quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)).

"Where an adversary wishes to exclude a potential juror because of bias, then, it is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality.  It is then the trial judge's duty to determine whether the challenge is proper." *Wainwright v. Witt*, 469 U.S. 412, 423 (1985) (citations omitted).  The trial court's determination is a determination "of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton v. Yount*, 467 U.S. 1025, 1036 (1984) (citation omitted). A state court decision based on a factual determination will not be overturned on factual grounds unless it was objectively unreasonable in light of the evidence presented in the state court proceeding and not simply erroneous or incorrect.  *Keith v. Mitchell*, 455 F.3d 662, 669 (6th Cir. 2006) (citing *Williams*, 529 U.S. at 409-11); *see also Young v. Hofbauer*, 52 F. App'x 234, 237 (6th Cir. 2002).  The state court's factual determination is entitled to a presumption of correctness, which is rebuttable only by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

*Voir dire* questioning exposed Juror 13's potential biases in Petitioner's case.  Juror 13, disclosed that he knew Detective Brad Wise, one of the potential witnesses in the case.  (Trial Tr. I, ECF No. 33-4, PageID.656, 659.)  This exchange followed:

The Court:    All right.  You know him to be a detective obviously and know him to be a police officer?

Juror No. 13:  Yes.

The Court:    How are you acquainted with him?

21

Juror No. 13:  He works with my brother [who] is also a detective for Battle Creek, Tim Leper.  He was also involved in my daughter's CSC case.  He was investigating detective in that case.

The Court:    Your brother is a police officer?

Juror No. 13:  Yes.

The Court:    All right.  Well, that brings up two issues then.  First of all, do you think that your association with Mr. Wise might affect your ability to weigh his testimony by the same standard you'd use with any witness?

Juror No. 13:  No.

The Court:    Are you satisfied you'd judge his testimony just as carefully as you would any witness, even those you have no knowledge of?

Juror No. 13:  Right.

The Court:    All right.  Does the fact that your brother is a police officer affect your ability to weigh and to scrutinize the testimony of police officers?

Juror No. 13:  No.

The Court:    You're satisfied you would not give them-give their testimony more weight because of the fact that your brother's involved in law enforcement?

Juror No. 13:  Yes.

The Court:    You would not give them more weight?

Juror No. 13:  No.

The Court:    Okay.  All right.  Now you indicated that your daughter was apparently the victim of an offense which was investigated.  Is that still pending?

Juror No. 13:  No.

The Court:    Was it-Did it result in a criminal trial?

Juror No. 13:  Yes, sir.

The Court:    Was there a trial or resolution of a plea?

Juror No. 13:  Resolution before the trial.

22

> The Court:      How long ago was that?
>
> Juror No. 13:  Six years.
>
> The Court:      Six years.  All right.  Does the fact that  your daughter was the victim of apparently and assaultive offense affect your ability to be a fair juror in this kind of case which also obviously involves an assault?
>
> Juror No. 13:  I don't believe so, no.
>
> The Court:      All right.  That's the only name you recognized.  There are a number of police officers also on this list beyond Mr. Wise's name.  You're acquainted with them?
>
> Juror No. 13:  No.

(*Id.*, PageID.659-660.)  Petitioner's counsel explored the issue further:

> [Counsel]:      Okay, . . . . , you indicated that you're a friend of Detective Wise.
>
> Juror No. 13:  Not a friend.  I know who he is.
>
> [Counsel]:      You-into a social friendship?
>
> Juror No. 13:  No.
>
> [Counsel]:      I-Okay.  I thought-I was under the impression-you didn't socialize with him or see him regularly or-
>
> Juror No. 13:  No.
>
> [Counsel]:      Okay.  Thank you.  I have nothing further.

(*Id.*, PageID.676-677.)

Juror No. 13's disclosures revealed three potential sources of bias.  His acquaintance with a potential witness, his family relationship with a member of the police force that investigated the crime, and his family relationship with a victim of an assault several years before Petitioner's trial.  Petitioner's counsel was not troubled by Mr. Jenkins's disclosures.  He

23

left Mr. Jenkins on the jury even though peremptory challenges were still available to him when he accepted the jury.

The potential bias flowing from Juror No. 13's acquaintance with a potential witness never came to fruition because the witness, Detective Wise, never testified at Petitioner's trial.  Juror No. 13 indicated that the remaining potential sources of bias, the family relationship with a police officer and the family relationship with a victim of an unrelated crime, would not impact his consideration of the evidence or sway his decision in Petitioner's case.  Under *Patton*, the question remains, should Juror No. 13 be believed?

Petitioner's counsel apparently believed Juror No. 13's "protestations of impartiality."  The trial court, in concluding that Petitioner's challenge was without merit, believed Juror 13 as well.  The trial court's factual determination is presumed to be correct.  Petitioner has failed to present any evidence, much less clear and convincing evidence, that Juror No. 13 should not be believed.[4]  Accordingly, Petitioner is not entitled to habeas relief.

VII.    Bad Jury Instructions (Habeas Issues V and VI)

Petitioner challenges two parts of the trial court's final jury instructions.

---

[4] Moreover, the Sixth Circuit has repeatedly determined that the degree of relationship that Juror No. 13 had to Petitioner's case is not sufficient to evidence a bias that violates the Sixth Amendment.  *See, e.g. United States v. Weir*, 587 F. App'x 300, 305 (6th Cir. 2014) (fact that juror's sister's husband's brother had been married to kidnapping victim's daughter did not require juror's disqualification for bias); *United States v. Tab*, 259 F. App'x 684, 692 (6th Cir. 2007) (fact that juror had met victim's father years before did not require disqualification for bias); *United States v. Cornell*, 162 F. App'x 404, 418 (6th Cir. 2006) (fact that juror was acquainted with witness did not require disqualification for bias); *United States v. Gill*, 75 F. App'x 322, 327-28 (6th Cir. 2003) (fact that juror's brother-in-law worked for sheriff's department and sister-in-law had previously worked for state police and, consequently, juror was acquainted with state police officer witness did not require disqualification for bias); *United States v. Crawford*, 60 F. App'x 520, 534-35 (6th Cir. 2003) (fact that juror knew an ATF agent that may have worked on the case did not require disqualification for bias); *United States v. Harris*, 293 F.3d 970, 976 (6th Cir. 2002) (fact that juror worked with prosecution's expert's husband did not require disqualification for bias).

## A.    Aiding and Abetting

First, Petitioner contends the trial court misled the jury when the court stated:

> Now, in this case, the prosecutor's theory is that either the defendant directly committed the offense of open murder, or armed robbery, of unlawful imprisonment or was intentionally assisting someone else in the commission thereof. This is the definition of the elements which must be proven by the prosecution beyond a reasonable doubt before there can be a conviction under the theory of so-called aiding and abetting.

(Trial Tr. VI, ECF No. 33-9, PageID.1024.)  Petitioner argues that only the armed robbery or unlawful imprisonment charges included a theory of aiding and abetting; the open murder charge did not.  Therefore, Petitioner claims, the trial court misled the jury and the jury may have erroneously convicted Petitioner on the theory that he aided and abetted open murder.  The trial court rejected Petitioner's claim as meritless.  (Calhoun Cty. Cir. Ct. Order, ECF No. 33-16. PageID.1543.)

Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review.  Instead, Petitioner must show that the erroneous instruction so infected the entire trial that the resulting conviction violates due process.  *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  *See also Estelle v. McGuire*, 502 U.S. 62, 75 (1991) (erroneous jury instructions may not serve as the basis for habeas relief unless they have so infused the trial with unfairness as to deny due process of law); *Rashad v. Lafler*, 675 F.3d 564, 569 (6th Cir. 2012) (same); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).  If Petitioner fails to meet this burden, he fails to show that the jury instructions were contrary to federal law.  *Id.*

The Supreme Court has cautioned that courts must not "parse [jury instructions] too finely[;]" instead, they "must be evaluated not in isolation but in the context of the entire charge." *Jones v. United States*, 527 U.S. 373, 392 (1999).  Considered against the entire charge,

25

there was really no risk that the jury would find Petitioner guilty of open murder on a theory that the prosecutor had not even presented—an aiding and abetting theory—because the court also told the jury "[f]or the offense of first-degree premeditated murder the prosecution must prove each of the following elements beyond a reasonable doubt: first that the defendant caused the death of Oscar Romano.  That is, that he died as a result of a gunshot wound to the head fired by the defendant."  (Trial Tr. VI, ECF No. 33-9, PageID.1021.)  The court used the same language for the first element of felony-murder.  (*Id.*, PageID.1021-1022.)

Moreover, aiding and abetting was a part of the prosecutor's theory with regard to the felony-murder charge.  The court included the following language as part of the felony-murder instruction:

> The defendant must have either been committing or helping someone else commit the crime of armed robbery.  To help means to perform acts or give encouragement before or during the commission of the crime, aided or assisted in its commission.  At the time of giving aid or encouragement the defendant must have intended the commission of the offense of armed robbery.

(*Id.*, PageID.1022.)  Thus, it was entirely accurate, and not misleading, for the court to later say that aiding and abetting was relevant to the open murder charge.

The language that Petitioner finds objectionable did not render his trial unfair.  The trial court's conclusion that Petitioner's claim was meritless is not contrary to, or an unreasonable application of, clearly established federal law.  Accordingly, Petitioner is not entitled to habeas relief on this jury instruction claim.

### B.    Involuntary Manslaughter

Petitioner's second challenge is premised on the trial court's refusal to instruct the jury regarding statutory involuntary manslaughter.  Petitioner's counsel asked the trial court to

instruct the jury regarding voluntary manslaughter, and also statutory involuntary manslaughter under Mich. Comp. Laws § 750.329, as lesser included offenses of the open murder charge.  An understanding of the various Michigan "killing" crimes is necessary to understand the trial court's analysis of the issue.  In Michigan, murder is an intentional killing.  First-degree murder is a statutory crime.  Mich. Comp. Laws § 750.316 identifies three circumstances that would raise an intentional killing to the level of first-degree murder: premeditated killing; felony murder; and the murder of a peace or corrections officer.  All other kinds of murder are second-degree murder. Mich. Comp. Laws § 750.317.

In Michigan there is another "killing" crime know as manslaughter.  "[U]nder Michigan law, the difference between second-degree murder and [voluntary] manslaughter is that a manslaughter conviction requires the defendant to show, by a preponderance of the evidence, that he killed in the 'heat of passion,' with such passion caused by 'adequate provocation,' without 'a lapse of time during which a reasonable person could control his actions.'"  *Ruelas v. Wolfenbarger*, 580 F.3d 403, 410 (6th Cir. 2009) (quoting *People v. Mendoza*, 664 N.W.2d 685, 690 (Mich. 2003)).  Michigan also recognizes another category of manslaughter, characterized as involuntary manslaughter.  "Under Michigan law, a homicide committed with the mens rea of malice is murder. . . . [a] homicide committed with the lesser mens rea of gross negligence or an intent only to injure is involuntary manslaughter."  *McMullan v. Booker*, 761 F.3d 662, 668 (6th Cir. 2014) (citing *People v. Gillis*, 712 N.W.2d 419, 438 (Mich. 2006)).  Then, the legislature expanded the concept of involuntary manslaughter by enacting Mich. Comp. Laws § 750.329, which provides:

> A person who wounds, maims, or injures another person by discharging a firearm that is pointed or aimed intentionally but without malice at another person is guilty of manslaughter if the wounds, maiming, or injuries result in death.

Mich. Comp. Laws § 750.329(1).  The Michigan Court of Appeals has opined that the legislature, by this statute, intended to punish the intentional pointing of a firearm which results in death even if the defendant did not act in a grossly negligent manner.  *People v. Duggan*, 320 N.W.2d 241, 242 (Mich. Ct. App. 1982); *see also People v. Maghzal*, 427 N.W.2d 552, 555 (Mich. Ct. App. 1988).

The Michigan Supreme Court has held that second-degree murder is a lesser included offense of first-degree murder.  *People v. Carter*, 236 N.W.2d 500, 502 (Mich. 1975). That court has also concluded that voluntary and involuntary manslaughter are lesser included offenses of any murder charge.  *Mendoza*, 664 N.W.2d at 685.  The Michigan Supreme Court, however, has concluded that statutory involuntary manslaughter is not a lesser included offense of second-degree murder because it includes "two elements that are not required to prove second degree murder: (1) that the death resulted from the discharge of a firearm and (2) that the defendant intentionally pointed a firearm at the victim." *People v. Smith*, 731 N.W.2d 411, 415 (Mich. 2007). Because voluntary and involuntary manslaughter are lesser included offenses of second-degree murder, it necessarily follows that statutory involuntary manslaughter cannot be a lesser included offense to voluntary or involuntary manslaughter.  Moreover, because the two elements that differentiate statutory involuntary manslaughter from second-degree murder are not elements of first-degree murder, it follows that statutory involuntary manslaughter is also not a lesser included offense of first-degree murder.

With that background, the Court will examine the trial court's two justifications for not giving the statutory involuntary manslaughter instruction as requested by Petitioner.   Before closing arguments, the court explained:

> As to the request that the jury be instructed on involuntary manslaughter, I am not satisfied based on appellate law, specifically, the Michigan Supreme Court cases of *People v. Cornell* and *People v. Hernandez*, that the theory of involuntary manslaughter is supported by a rational view of the evidence in this case.
>
> It is in-it's clear from all of the testimony that at the moment that the evidence suggests-that at the moment of Mr. Romano's death the defendant had the gun pointed directly at his head at relatively short range.  Given the testimony of the witnesses together with the evidence of the stippling upon the left side of his face, the evidence suggests rationally that it was an intentional act, albeit perhaps mitigated to voluntary manslaughter by virtue of evidence suggesting a heated argument at that moment in which the defendant was angry.
>
> The evidence would suggest about the fact that he had been-he had provided money for the purchase of drugs which Mr. Romano had not produced and then he refused to return the money.  I-I'm not satisfied that there is an appropriate basis upon that evidence for an involuntary manslaughter instruction and so that request is denied.
>
> I am satisfied that the theory of voluntary manslaughter is well supported by the evidence if the jury chooses to accept it, but not involuntary manslaughter.

(Trial Tr. VI, ECF No. 33-9, PageID.997.)  Then, after closing arguments, the court supplemented its initial position:

> All right. I want to return to the record briefly on the issue of jury instructions. And to supplement this court's finding already made concerning the denial of Mr. McDonough's request for an instruction on involuntary manslaughter, firearm intentionally aimed—under 750.329. I believe the balance of my finding or the substance of my finding was that was not a—that a lesser included instruction was not supported by a rational view of evidence in this case.
>
> I think more properly that offense is not a necessarily included offense of murder, in that there are elements in 750.329 that are different and are not included within the elements of either theory of murder in this case.  Now, factually they may be. That not law.  The law is in order to support an instruction on a necessarily included offense that all of the elements of the included offense must be included within the principal offense.  And they are clearly not with respect to 750.329.  One does not

29

automatically commit involuntary manslaughter by firearm intentionally aimed by the commission of a murder legally.  For that reason that supplement I believe supplements I believe the court's finding with respect to that.

(*Id*., PageID.1020.)

        The Due Process Clause requires that every element of the charged crime be proven beyond a reasonable doubt.  *In re Winship*, 397 U.S. 358, 364 (1970).  When a jury is not properly instructed with regard to the elements of the charged crime, the due process right to proof beyond a reasonable doubt is implicated.  *Sandstrom v. Montana*, 442 U.S. 510 (1979).  It is the prerogative of the state, however, to define the elements of the crime and the federal courts are bound by their determination.  *See Johnson v. United States*, 559 U.S. 133, 138 (2010) ("We are, however, bound by the Florida Supreme Court's interpretation of state law, including its determination of the elements . . . ."); *Jackson*, 443 U.S. at 324 n.16 ("The respondents have suggested that this constitutional standard will invite intrusions upon the power of the States to define criminal offenses.  Quite to the contrary, the standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law. ").  It is also the prerogative of the state to determine what charge or charges to bring:

> In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.  Within the limits set by the legislature's constitutionally valid definition of chargeable offenses, "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation" so long as "the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification."  *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446.

*Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) (footnote omitted).  The prosecutor did not bring a charge of statutory involuntary manslaughter against Petitioner.

Similarly, the Due Process Clause guarantees criminal defendants a meaningful opportunity to present a complete defense.  *California v. Trombetta*, 467 U.S. 479, 485 (1984).  Nonetheless, it is also the prerogative of the state to define whether or not a defense applies to a particular crime.  *See Foucha v. Louisiana*, 504 U.S. 71, 96 (1992) (acknowledging "the general rule that the definition of both crimes and defenses is a matter of state law . . . ."); *Gimotty v. Elo*, 40 F. App'x 29, 32 (6th Cir. 2002) ("States are free to define the elements of, and defenses to, crimes. . . . In determining whether a petitioner was entitled to a defense under state law, federal courts must defer to state-court interpretations of the state's laws . . . .")

Petitioner contends the trial court's refusal to read the statutory involuntary manslaughter instruction deprived him of a defense.  That is simply not the case.  Petitioner was able to, and did, argue that the shooting was not intentional.  The jury was properly instructed with regard to intent such that if the jury concluded the shooting was not intentional he would not have been found guilty of the charged crimes.  Put differently, the jury did not reject Petitioner's argument of accident because the instructions denied them the opportunity to consider it; they rejected the argument because there was simply no evidence to support it.  Other than the theoretical possibility that an event that appears to be purposeful could actually be accidental, Petitioner has not identified any evidence that supports the inference that this shooting was accidental.  The trial court's initial reaction to Petitioner's request—that there was simply no evidence to support an inference that the shooting was anything but intentional—was entirely reasonable on the record.

Finally, the Due Process Clause requires providing lesser included offense instructions in <u>capital</u> cases. *Beck v. Alabama*, 447 U.S. 625 (1980).  Lesser included offense instructions were also required in <u>noncapital</u> cases under the English common law and they are still required under the common law or by statute in every state and in the federal courts, if and when the evidence supports it. *Id.* at 633-34, 636 n.11, 12.

Even though the courts of this nation are in complete accord as to the propriety of lesser included offense instructions, the Supreme Court has never held that lesser included offense instructions are required as a matter of constitutional due process in noncapital cases. *Id.* at 638 n.14; *see also Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990) (en banc) ("[The failure to instruct on lesser included offenses in noncapital cases [is not] such a fundamental defect as inherently results in a miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure[.]").  Thus, a state court's refusal to read a lesser included offense instruction cannot be contrary to, or an unreasonable application of, clearly established federal law.

Moreover, whether or not a particular crime is a lesser included offense of a charged crime is a matter of state law. *Richie v. Workman*, 599 F.3d 1131, 1136 (10th Cir. 2010) ("Whether an offense is a lesser-included offense is a matter of state law."); *see also Hopkins v. Reeves*, 524 U.S. 88, 95-99 (1998) (looking to state law to determine whether offenses were lesser included offenses of charged crime and noting the various tests states employed to determine whether one offense was a lesser included offense of another).  The state court's determination on the issue would be "axiomatically correct[.]" *Bagby*, 894 F.2d at 795.  As noted above, the Michigan courts

have determined that statutory involuntary manslaughter is not a lesser included offense of any other murder or manslaughter charge.

It is not the province of a federal habeas court to re-examine state-law determinations on state-law questions. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle*, 502 U.S. at 68. The decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983). The Sixth Circuit repeatedly has recognized "'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'" *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76). Accordingly, the state courts' determinations regarding the elements of the crimes charged, the lesser included offenses for the crimes charged, and the availability of defenses to the crimes charged, bind this Court; they are "axiomatically correct" and conclusively resolve Petitioner's instructional challenges. *Bagby v. Sowders*, 894 F.2d 792, 795 (6th Cir. 1990). Under the circumstances, the state court determinations were neither contrary to nor an unreasonable application of clearly established federal law. Therefore, Petitioner is not entitled to habeas relief.

VIII.    Prosecutorial Misconduct (Part of Habeas Issue IV and Habeas Issue VII)

To be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 643). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which

the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental.  *See United States v. Young*, 470 U.S. 1, 11-12 (1985).  The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court.  *See id.* at 12-13;  *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)).  Indeed, "[t]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly*, 416 U.S. at 645).  Thus, in order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Parker v. Matthews*, 567 U.S. 37, 47 (2012) (quoting *Harrington*, 562 U.S. at 103).  Here, the state appellate court concluded the first claim was meritless.  The trial court determined that Petitioner's other prosecutorial claims were also meritless.  As set forth below, those conclusions were justified.

## A.    Facts Not in Evidence

During the prosecutor's closing rebuttal, he argued:

[Petitioner] didn't accidentally drive to Oscar Romano's house.  He didn't just drive down Magnolia Street because Magnolia Street has big signs on it saying drug

> dealers here, come get your dope.  It's rather obvious he dealt with him before.
> Because he drives up to the house.  He tells [Glenn and Turman] Okay, I'm going
> to go talk to my man about some money.  He gets out of the car.  He goes and walks
> up to the back of the house.  Presumabl[y] it's Oscar that comes out, gets into that
> silver Tahoe, backs down the driveway, says follow me, goes around the corner,
> says wait here, I'll be back.  This is all based on prior dealings.

(Trial Tr. VI, ECF No. 33-9, PageID.1119.)  Petitioner contends it was improper for the prosecutor

to argue that Petitioner had dealt with the victim previously because there were no facts in evidence

to support the argument.

A prosecutor is not limited to simply recounting the evidence during closing

argument.  He may also argue reasonable inferences from the evidence.  *Byrd v. Collins*, 209 F.3d

486, 535 (6th Cir. 2000); *see also Young*, 470 U.S. at 8 n.5 (Court acknowledged as a useful

guideline the American Bar Association Standard: "The prosecutor may argue all reasonable

inferences from the evidence.").  Nonetheless, it is unquestionably improper for a prosecutor to

argue facts not in evidence.  *Abela v. Martin*, 380 F.3d 915, 929 (6th Cir. 2004) (citing *Berger*,

295 U.S. at 78).

The Michigan Court of Appeals concluded that the prosecutor was simply inviting

the jury to infer that Petitioner and Romano had previous dealings based on other facts in evidence:

> Defendant argues that he is entitled to a new trial because the prosecutor committed
> misconduct by arguing facts not in evidence, when he argued during his rebuttal
> argument that defendant had prior dealings with murder victim Oscar Romano.  We
> disagree.
>
> This Court reviews the prosecutor's comments in their context to determine if
> defendant was denied a fair trial.  *People v Bahoda*, 448 Mich 261, 266-267; 531
> NW2d 659 (1995).  In doing so, we recognize that prosecutors are free to argue all
> reasonable inferences from the evidence and that prosecutors have "wide latitude
> in arguing the facts and reasonable inferences, and need not confine argument to
> the blandest possible terms."  *Id*. at 282; *People v Dobek*, 274 Mich App 58, 66;
> 732 NW2d 546 (2007).  A prosecutor may not, however, "make a factual statement
> to the jury that is not supported by the evidence." *Dobek*, 274 Mich App at 66.

Defendant told Leroy Glenn and Vernon Turman that he wanted to talk to his "friend" immediately before he drove directly to Romano's home.  When defendant arrived at Romano's home, he walked directly to the back door.  Within 15 minutes of arriving at Romano's home, defendant purchased marijuana from Romano and trusted Romano with money to purchase more marijuana.  Reasonable inferences can be drawn from that testimony, specifically that Romano was indeed defendant's friend, defendant had prior dealings with Romano, and defendant knew where he lived.  He was comfortable walking to Romano's backdoor and trusting Romano with money to buy more marijuana.  Thus, the prosecutor argued reasonable inferences from facts in evidence, and the prosecutor did not commit misconduct. *Bahoda*, 448 Mich at 282.

(Mich. Ct. App. Op., ECF No. 33-12, PageID.1049-1050.)

Petitioner argues that Glenn's testimony does not support the inference.  In *Coleman v. Jackson*, 566 U.S. 650 (2012), the Supreme Court provided guidance "in determining what distinguishes a reasoned inference from 'mere speculation.'"  *Id*. at 655.  The Court described a reasonable inference as an inference that a rational jury could make from the facts.  Certainly, the inference urged by the prosecutor rationally flows from the identified facts.  It is not compelled by those facts.  The inference is not even more likely than not.  It is simply rational.  To succeed in his challenge, therefore, Petitioner must show that the inference is irrational.  He has not made, and cannot make, that showing.

The factual determinations by the court of appeals are well-supported in the record, specifically Glenn's testimony.  (Trial Tr. V, ECF No. 33-8, PageID.967-969.)  The state appellate court's factual findings in support of its determination therefore are not unreasonable and the court's ultimate conclusion is neither contrary to, nor an unreasonable application of, clearly established federal law.  Accordingly, Petitioner is not entitled to habeas relief on this claim.

## B.        Bolstering/Vouching

The prosecutor's questioning of Leroy Glenn included a series of questions relating to the terms of Mr. Glenn's plea agreement:

Q:      Now before we get into anything more about this right now, I need to ask you, you were charged with a number of crimes as it relates to this case were you not?

A:      Yeah.

Q:      Okay, and at some point, this time you were appointed Jim Jordan as an attorney?

A:      Yeah.

Q:      Okay, Mr. Jordan and I had some discussions and at some point in time along with Mr. Jordan I came to talk to you.  You remember that?

A:      Yeah.

Q:      Okay.  And Detective Brad Wise, do you know who he is?

A:      Yeah.

Q:      Okay. He was along, he spoke to you also?

A:      Yes.

Q:      Okay.  As a result of that conversation you were offered a plea deal, were you not?

A:      Yes.

Q:      Okay. Do you know what the terms of your plea deal were?

A:      He just told me 15 years.

Q:      You have to speak up.

A:      Just told me 15 years.

Q:      They told you 15 years.

A:      Yeah.

Q:      15 years for pleading guilty to second-degree murder?

A:      Yeah.

Q:      All right.  And the 15 years was the minimum sentence was it not?

A:      I think so.

Q:      Okay. As best you know it was the minimum sentence?

A:      Yeah.

Q:      Okay and this was in exchange for you testifying this case, right?

A:      Guess so.

Q:      When you mean  you guess so?

A:      I guess that's what it was.

Q:      Okay. And that was testifying truthfully in his case.

A:      Yeah, yeah.

Q:      Okay.  Because if you don't testify,  you don't – you don't cooperate, you don't testify truthfully any idea what happens to you?

A:      No.

Q:      Well, I came and talked to you the other day with Detective Wise, didn't I?

A:      Yeah.

Q:      Didn't you ask me question about – about your plea deal?

A:      Yeah.

Q:      Didn't we talk about what would happen if you decided not to testify, you decided not to be truthful in your testimony?

A:      Yeah.

Q:      What did I tell you?

A:      You said that you would prosecute me as well as – like you would do Mr. Palmer.

Q:      Okay.  I said that I would prosecute you in the same manner that we are Paris Palmer, right?

A:      Yeah.

Q:      You'd have a potential of a greater sentence?

A:      Yeah.

(Trial Tr. V, ECF No. 33-8, PageID.964-965.)  Petitioner argues that the references to Glenn's deal being contingent on truthful testimony constitute impermissible bolstering of or vouching for Glenn's credibility.

The federal courts have generally recognized two types of objectionable vouching. *See Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008); *Brown v. McKee*, 231 F. App'x 469, 478 (6th Cir. 2007) (citing *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999)); *but see Wogenstahl v. Mitchell*, 668 F.3d 307, 328-29 (6th Cir. 2012) (treating the two aspects of vouching as part of a single standard).  The first type impermissibly places the government's prestige behind the witness to bolster the witness' credibility.  *Francis*, 170 F.3d at 550; *United States v. Carroll*, 26 F.3d 1380, 1388-89 (6th Cir. 1994); *Drew v. Collins*, 964 F.2d 411, 419 (5th Cir. 1992).  In the second type of impermissible vouching, also known as bolstering, the prosecutor invites the jury to believe that there is other evidence, known to the prosecutor but not introduced into evidence, justifying the prosecutor's belief in the defendant's guilt.  *See Francis*, 170 F.3d at 551; *United States v. Medlin*, 353 F.2d 789, 796 (6th Cir. 1965);  *Henderson v. United States*, 218 F.2d 14, 19 (6th Cir. 1955).  Neither type of vouching is involved in this case.[5]

---

[5] The Court observes that, notwithstanding the Sixth Circuit's continuing application of its own precedent on vouching, *see Wogenstahl*, 668 F.3d at 328-29 (citing *Johnson*, 525 F.2d at 482), the Supreme Court has not directly held that vouching amounts to prosecutorial misconduct.  Given the Supreme Court's recent admonitions to the courts regarding the limits of clearly established general principles, it is doubtful that vouching has been clearly established by the Supreme Court as a due process violation.  *See, e.g., Lopez v. Smith*, 135 S. Ct. 1, 3 (2014) (holding, with

The Sixth Circuit has explored whether and when a prosecutor's reference to the requirement to testify truthfully in a plea agreement might rise to the level of vouching.  Simply inquiring as to the existence of a term in the plea agreement regarding truthful testimony does not violate due process.  *See United States v. Reid*, 625 F.3d 977, 984 (6th Cir. 2010) (concluding that "[b]ecause the prosecutor limited his questions and comments to th[e] facts [of the plea agreements] and did not imply any special knowledge regarding the credibility or truthfulness of the cooperating witnesses, the prosecutor did not improperly vouch for the witnesses."); *United States v. Presley*, 349 F. App'x 22, 26-27 (6th Cir.2009) (finding no improper vouching where the prosecutor "simply mentioned the existence of the plea agreements" with the witness but "did not imply that these agreements ensured that they were being truthful"); *United States v. Trujillo*, 376 F.3d 593, 608-09 (6th Cir. 2004) ("[T]he prosecutor did not offer any personal observations or opinions as to the veracity of [the witnesses], nor did she place the prestige of the Government behind their credibility.  Rather, the prosecutor's questions and comments merely encompassed the terms of [the witnesses'] plea agreements . . . ."); *United States v. Tocco*, 200 F.3d 401, 416-17 (6th Cir. 2000) (introduction of plea agreement which contained requirement of truthful testimony, standing alone, was not improper); *Francis*, 170 F.3d at 550 ("We have allowed a prosecutor to refer to the plea agreement of a testifying witness . . . .The prosecutor may elicit testimony about its terms, attack the credibility of the witness because of it and even refer to the

---

respect to a claim of self-representation, that "[c]ircuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced.'") (quoting *Marshal v. Rodgers*, 569 U.S. 58, 64 (2013); *White*, 572 U.S. at 421 (same, respecting a claim regarding the privilege against self-incrimination); *Parker*, 567 U.S. at 49 ("The highly generalized standard for evaluating claims of prosecutorial misconduct set forth in *Darden* bears scant resemblance to the elaborate, multistep test employed by the Sixth Circuit here.").

plea agreement of a government witness in an attempt to deflect defense counsel's use of the agreement to attack the witness's credibility.") (citation omitted).

It is certainly possible to stray beyond the permissible boundary of simply referencing the terms of the plea agreement.  In *Carroll*, 26 F.3d at 1380 the court identified such a trespass:

> [T]he prosecutor blatantly implied that the Patricks' plea agreements ensured that the witnesses were truthful; the prosecutor did not give the jury any inkling that the government has no independent means of discerning truthfulness.  Further, the prosecutor placed the prestige of the government, and even of the court, behind the credibility of the Patricks, by stating that, if the government or the judge did not believe that the witnesses were being truthful, the witnesses would be in jeopardy. This implied to the jury that the government and the court were satisfied that the witnesses were truthful.  This constitutes improper vouching.

*Id.* at 1389.  Petitioner's prosecutor did not make any such statements.

The trial court concluded that Petitioner's bolstering claim was meritless. Petitioner has failed to demonstrate that the state court's determination is contrary to or an unreasonable application of clearly established federal law.  Accordingly, Petitioner is not entitled to habeas relief on his claim.

### C.    Impermissible Comment on Petitioner's Silence

During the prosecutor's closing argument, he described Glenn's testimony as "undisputed accomplice testimony in this case . . . ."  (Trial Tr. VI, ECF No. 33-9, PageID.1005.) Petitioner argues that the term "undisputed" describes the testimony and, thus, impermissibly comments on Petitioner's failure to dispute Glenn's testimony with Petitioner's own testimony. Petitioner relies on authority that states: "when a prosecutor refers to testimony as uncontradicted where the defendant has elected not to testify and when he is the only person able to dispute the

41

testimony, such reference necessarily focuses the jury's attention on the defendant's failure to

testify and constitutes error." *United States v. Buege*, 578 F.2d 187, 188 (7th Cir. 1978).

The Sixth Circuit has analyzed the issue in greater depth:

> The fifth amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself . . . ."  An important corollary to that right is that neither a prosecutor nor a trial judge may comment upon a criminal defendant's failure to testify.  *Griffin v. California*, 380 U.S. 609 (1965).

> The rule set forth in *Griffin* applies to indirect as well as direct comments on the failure to testify.  Cases involving direct comments pose little difficulty as the court must reverse unless the prosecution can demonstrate that the error was harmless beyond a reasonable doubt.  *Chapman v. California*, 386 U.S. 18 (1967); *Eberhardt v. Bordenkircher*, 605 F.2d 275 (6th Cir. 1979).  Cases such as the present one, involving indirect comments on the failure to testify are more troublesome.  General references to evidence as uncontradicted, while not recommended, may not reflect on the defendant's failure to testify where witnesses other than the defendant could have contradicted the evidence.  *See United States v. Thurmond*, 541 F.2d 774 (8th Cir. 1976), *cert. denied*, 430 U.S. 933 (1977).  Such statements are more objectionable where the facts are such that only the defendant could have contradicted the evidence in question.  *United States v. Robinson*, 651 F.2d 1188, 1197 (6th Cir.), *cert. denied*, 454 U.S. 875 (1981).  However, we recently refused to adopt a *per se* rule that comments as to the uncontradicted nature of evidence violated *Griffin* even where the evidence in question could only have been contradicted by the defendant.  *Butler v. Rose*, 686 F.2d 1163, 1170 (6th Cir. 1982) (en banc).  Rather, the court must conduct a "probing analysis of the context of the comments," *Robinson*, 651 F.2d at 1197, in order to determine "[w]hether the language used was manifestly intended to be or was of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify."  *Butler*, 686 F.2d at 1170.

*Raper v. Mintzes*, 706 F.2d 161, 164-65 (6th Cir. 1983).

Here, if the Court interprets "undisputed" to mean "uncontradicted"—the most

troubling possible interpretation—the prosecutor's use of the term would not have Fifth

Amendment implications because Petitioner was not the only witness who could have contradicted

Glenn's testimony.  Clark, Dimas, and Triggs corroborated much of Glenn's testimony.  The jury

could have taken the prosecutor's statement to mean that Glenn's testimony was consistent with

that of the other witnesses.

But, it does not appear that the prosecutor intended "undisputed" to mean "uncontradicted" or even to describe the testimony at all. The context suggests that the term "undisputed" describes Glenn's uncontested status as an accomplice. The trial court's instructions reinforce that interpretation:

> There's no question in this case by either side that Mr. Glenn took part in the crime that defendant-or crimes that the defendant is charged with committing and that he's already been convicted of at least on charge arising from that commission. Such a witness is called an accomplice. You should consider an accomplice's testimony closely and be very careful about accepting it. You may think about whether the accomplice's testimony is supported by other evidence because then it may be more reliable.

(Trial Tr. VI, ECF No. 33-9, PageID.1026.)

Under these circumstances, it simply cannot be said that the jury would naturally and necessarily take the prosecutor's use of the term "undisputed" to be a comment on Petitioner's failure to testify. Accordingly, the trial court's rejection of Petitioner's claim is not contrary to, or an unreasonable application of, clearly established federal law and Petitioner is not entitled to habeas relief on this claim.

### D.    Failure to Correct Perjured Testimony

Petitioner picks through the testimony of Clark, Dimas, and Triggs to find statements they made at trial that were inconsistent with testimony at the preliminary examination or statements they reportedly made to the police. Whenever Petitioner finds such an inconsistency, he contends that the testimony at trial was false. He claims that his trial was unfair because the prosecutor never corrected the false testimony. The trial court concluded that Petitioner's claim was meritless.

The Supreme Court repeatedly has recognized that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands

43

of justice.'"  *Giglio v. United States*, 405 U.S. 150, 153 (1972) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)).

> The knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. In order to establish prosecutorial misconduct or denial of due process, the defendants must show (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false. The burden is on the defendants to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony.

*United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989) (citations omitted).  *See also Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998).  Petitioner bears the burden of demonstrating that the testimony was actually perjured.  *Lochmondy*, 890 F.2d at 822.  "[M]ere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony."  *Id.*

Petitioner has failed to establish that the trial testimony of Clark, Dimas, or Triggs was false.  He bases his entire argument on showing inconsistencies between their trial testimony and earlier testimony or statements.  He has not shown which statements, if any, were false.  Moreover, Petitioner has not shown that the prosecution knew that the trial testimony was false.  Accordingly, the trial court's rejection of Petitioner's claim as meritless is not contrary to, or an unreasonable application of, clearly established federal law and Petitioner is not entitled to habeas relief on this claim.

### E.    Misstated Reasonable Doubt Standard

Petitioner claims that the prosecutor misstated the reasonable doubt standard during *voir dire*.  The prosecutor's questioning of the jury included the following statements:

> Prosecutor:    Okay.   You all heard the judge define for you a term called reasonable doubt.  Do  you recall that? . . . The judge told you that the burden of proof is—to prove the elements of an offense the people have to prove the elements of an offense beyond a reasonable doubt.  Reasonable doubt is a fair and honest doubt based on evidence or lack of evidence.  It's not an imaginary or possible

doubt, but just that, a doubt that is based on reason and common sense.  Yeah, that's a lot of words isn't it? . . . Sure.  Okay.  Let me ask you this—I'll try to simplify if. Do you think there's a difference between the term beyond a reasonable doubt and the beyond a doubt? . . . [T]hat would be the word "reasonable," right? . . . So you as a juror would have to hold the people of . . . Michigan and evidence to a particular standard.  [It] has to be beyond a reasonable doubt. . . .  Does that—does that evidence have to be proven or do those elements have to be proven beyond all doubt? . . . Or, beyond any doubt? . . . So do you—so that there is some way that the proof can have a little bit of doubt to it, but if it's an imaginary doubt, or it's a possible doubt, that evidence can still meet the burden of proof.  Does that make sense? . . . Anybody confused by that?  Very good.  Thank you.  Would  you all agree to hold us only to the standard that [the] judge gives you instead of some other kind of standard?

(Trial Tr. I, ECF No. 33-4, PageID.664) (juror responses removed).  Petitioner claims these statements watered down the burden of proof and tainted his entire trial.  The trial court rejected Petitioner's claim as meritless.

Petitioner's conclusion that the prosecutor's statement "watered down" the burden of proof is flimsy.  The prosecutor simply repeated the words the judge used in the initial instructions.  Moreover, if the prosecutor's words had any impact on the jury, it was remedied when the court, in its final instructions, again provided the meaning of the phrase "beyond a reasonable doubt" and also instructed the jury:

The lawyers' statement and arguments are not evidence.  They are only meant to help you understand the evidence and each side's legal theories.  The lawyers'—the lawyer's questions to the witnesses are not evidence.  You must consider those questions [only] as they . . . tend to give meaning to the witness' answers.  You should only accept things the lawyers say that are supported by the evidence or by your own common sense and general knowledge.

(Trial Tr. VI, ECF No. 33-9, PageID.1024.)  "The trial court's instructions are generally presumed to have been followed."  *Bales v. Bell*, 788 F.3d 568, 579 (6th Cir. 2015) (citing *Penry v. Johnson*, 532 U.S. 782, 799 (2001) ("We generally presume that jurors follow their instructions.")). Accordingly, the trial court's determination that Petitioner's claim is without merit—whether it is

based on the absence of prosecutorial misconduct or the absence of any prejudice—is not contrary

to, or an unreasonable application of, clearly established federal law.

### IX.    Ineffective Assistance of Counsel (Habeas Issues VIII, IX, X, and XI)

Petitioner contends that his trial counsel and his appellate counsel rendered

constitutionally ineffective assistance.  The Supreme Court in *Strickland* established a two-prong

test by which to evaluate claims of ineffective assistance of counsel: the petitioner must prove (1)

that counsel's performance fell below an objective standard of reasonableness; and (2) that

counsel's deficient performance prejudiced the defendant resulting in an unreliable or

fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge

a strong presumption that counsel's conduct falls within the wide range of reasonable professional

assistance."  *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the

challenged action might be considered sound trial strategy.  *Id.* (citing *Michel*, 350 U.S. at 101);

*see also Nagi*, 90 F.3d at 135 (holding that counsel's strategic decisions were hard to attack).  The

court must determine whether, in light of the circumstances as they existed at the time of counsel's

actions, "the identified acts or omissions were outside the wide range of professionally competent

assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance

was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the

judgment.  *Id.* at 691.  Counsel's failure to make a frivolous or meritless motion does not constitute

ineffective assistance of counsel.  *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010).

Moreover, as the Supreme Court repeatedly has recognized, when a federal court

reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of

*Strickland* is "doubly" deferential.  *Harrington*, 562 U.S. at 86 (citing *Knowles v. Mirzayance*, 556

U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 13 (2013); *Cullen v. Pinholster*, 563

U.S. 170, 190 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011).  In those circumstances, the

question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

### A.    Trial Counsel

Petitioner contends that his trial counsel failed him in several respects.

> 1.    counsel failed to impeach Clark, Dimas, and Triggs with their prior inconsistent statements or object to their perjurious testimony

As set forth above, there were inconsistencies between the statements Clark, Dimas, and Triggs made to police or at the preliminary examination, on the one hand, and their trial testimony on the other.  Also, as set forth above, Petitioner has failed to demonstrate that the testimony of Clark, Dimas, or Triggs, was perjurious.  Accordingly, it was not ineffective assistance for Petitioner's counsel to forego an objection to their testimony on that ground.

Petitioner has succeeded in demonstrating inconsistencies; but, his complaint that counsel failed to expose those inconsistencies on cross-examination is wrong.  A review of the cross-examinations of Clark, Dimas, and Triggs reveals that counsel peppered his questioning with references to the witnesses' prior statements and testimony, highlighting the differences.  Petitioner simply attributes a far greater significance to those differences than the jury did.  This Court has examined the statements from the police reports (at least those reports in the record) and the preliminary examination and compared them to the trial testimony.  There are differences.  But, the differences with regard to the clothing of the gunmen or where each person was at a particular time pale in comparison to the similarities that characterize each person's account over time or

that appear in the accounts from person to person.  The trial court's determination that Petitioners' challenge is meritless is not contrary to, or an unreasonable application of, *Strickland*.

2.    counsel failed to move to suppress in-court identifications based on an improper pretrial photographic lineup

As discussed above, there was no impropriety in the pretrial photographic lineup. Accordingly, it was not ineffective assistance for counsel to fail to move to suppress, or even object to, the in-court identifications at the preliminary examination or the trial.  "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013).  The state court's determination that this challenge is meritless is, therefore, not contrary to, or an unreasonable application of, *Strickland*.

3.    counsel failed to use a peremptory challenge to remove juror #13 and failed to object to jury tainted by the prosecutor's watered-down reasonable doubt standard

As set forth above, the prosecutor did not present a watered-down reasonable doubt standard and, even if he did, the trial court's subsequent instructions cured any possible prejudice to Petitioner.  Therefore, there was no prosecutorial misconduct and it was not ineffective assistance for counsel to fail to object.  Counsel's conduct was professionally reasonable and, even if it were not, no prejudice accrued to Petitioner.

With regard to Juror #13, the Court has already determined that Petitioner has failed to overcome the presumption of correctness enjoyed by the trial court's determination that the juror was not actually biased.  Absent a showing of bias, even if it were professionally unreasonable for counsel to fail to exercise a peremptory challenge to excuse Juror #13, Petitioner cannot show the prejudice required to prevail on his ineffective assistance claim. *See Tinsley v. Million*, 399 F.3d 796, 805 (6th Cir. 2005) ("Nor . . . has Tinsley satisfied the second element of this claim . . .Tinsley

48

has failed to show that any one of [the jurors] had "actual bias" against him, which is what is required to establish prejudice.") (citing *Miller v. Francis*, 269 F.3d 609, 616 (6th Cir. 2001)).

4.    counsel failed to obtain expert witnesses regarding blood spatter and identification

Petitioner speculates that an expert regarding blood spatter could have testified that the victim's blood on Petitioner's shirt was planted there and that an expert on eyewitness identification could have testified that the identifications by Clark, Dimas, and Triggs were inherently suspect.  In light of such potentially beneficial expert testimony, Petitioner contends counsel was ineffective for failing to obtain such experts.  Without regard to the reasonableness of counsel's actions—or inactions as the case may be—Petitioner has failed to demonstrate any prejudice from counsel's failure to call these defense experts.

"When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'" *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697).  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  *Strickland*, 466 U.S. at 697.  Here, Petitioner's failure to demonstrate prejudice is evident.  There is nothing in the record, other than Petitioner's rank speculation, as to what testimony an expert might have provided. "A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." *United States v. Ashimi*, 932 F.2d 643, 650 (6th Cir. 1991) (footnote omitted); *see also Paillette v. Berghuis*, 408 F. App'x 873, 887 (6th Cir. 2010) ("The salient point is that nobody knows what she would have said. Speculation cannot suffice to establish the requisite prejudice.").  Petitioner offers only speculation; that is manifestly

insufficient.  He is not entitled to habeas relief on his claim that his trial counsel was ineffective for failing to call expert witnesses.

> 5.    counsel was subject to an actual conflict of interest when he represented Petitioner

At the time Petitioner's trial counsel, Ward McDonough, was appointed, he was already representing Fernando Romano, Oscar Romano's brother, in another criminal proceeding. McDonough's representation of Romano continued until September 14, 2009, the date, coincidentally, that Petitioner was bound over to the Calhoun County Circuit Court.  *Compare* (Calhoun Cty. Docket Sheet Case # 2009 0000001896 FH, ECF No. 33-19, PageID.2000-2001) *with* (Calhoun Cty. Docket Sheet Case #  2009 0000002989 FC, ECF No. 33-1, PageID.463-472).

At Petitioner's trial, when Fernando Romano took the stand, Mr. McDonough approached the bench to advise the trial court of the prior representation.  The court permitted Mr. McDonough to continue the representation and question Fernando Romano.  After the testimony, the trial court put on the record the discussion that preceded Fernando Romano's testimony:

> The Court:    All right.  Mr. McDonough, before the testimony of Fernando Romano you approached the bench and had a conference there, and indicated  you had previously represented Fernando Romano.
>
> Mr. McDonough:    Yes, that's correct, judge.  I would indicate that at the time of the preliminary examination some—oh, in August—I think in September, I indicated to Judge Hallacy that I had previously represented Fernando Romano in a felonious assault case that had been concluded by the time of the preliminary examination.  My representation of him no longer existed.  I did, however, feel that because of the rule of professional conduct a present conflict or an appearance of conflict is something that should be addressed with the court.
>
> I did indicate to Judge Miller, I will also indicate to your honor, that both at the time of the preliminary examination and at today's hearing in view of the fact that my case was concluded with Mr. Fernando Romano, I did not believe that I had any conflict in continuing to proceed.
>
> And in addition, since I am now representing Mr. Palmer, I indicated to Mr. Palmer that I had represented Mr. Fernando Romano in a prior matter and as such had— was privy to certain information relative to that case about—to him personally, but

I indicated to my client that I did not believe there—there was anything—any information that was provided then before that exam or subsequent to that exam that would either interfere with any then existing representation of Mr. Romano or my present and continuing representation of my client Paris Palmer and Judge Hallacy agreed with me as to what I believed that in my personal and professional opinion felt that there wasn't any conflict.  I indicated that I not believe there was a conflict.  My sentiments in this matter are the same today.

The Court:    Was that case with—against Mr. Romano concluded before you were appointed in this case?

Mr. McDonough:    I believe it was, yes, judge.

The Court:    All right you have had no further contact with him as an attorney?

Mr. McDonough:    No, only at the exam attorney-client relationship.

The Court:    The end of that case was the end of your representation of him in any manner?

Mr. McDonough:    Yes, sir.

The Court:    All right.  Mr. Palmer, you've heard what Mr. McDonough has said?

The Defendant:    Yes, your honor.

The Court:    He explained that all to you at some previous time; is that true?

The Defendant:    Yes, your honor.

The Court:    You have any objection today to his representation of you?

The Defendant:    No, your honor.

The Court:    You wish to—that he continue to represent you?

The Defendant:    Yes, sir.

(Trial Tr. III, ECF No. 33-6, PageID.820-821.)  The problem with Mr. McDonough's presentation

during trial is that it is at least misleading and, in some respects, simply untrue.

One statement that McDonough makes in his presentation is that he told the district

court judge at the time of the preliminary examination (August 14, 2009), that his representation

of Fernando Romano was over.  That statement is false in two respects: first, McDonough's

representation of Romano was not over until September 14, 2009, when Romano was sentenced (Calhoun Cty. Docket Sheet Case # 2009 0000001896 FH, ECF No. 33-19, PageID.2000-2001); and second, McDonough did not tell the district court judge that the representation was over, he specifically told the judge that the representation was ongoing but that there was no actual conflict as a result.  (Prelim. Exam. Tr., ECF No 33-2, PageID.569-570) ("[I]t appears there will not be any conflicting testimony . . . ."). McDonough's report of the conflict to the district court specifically acknowledges that the conflict was disclosed for the first time a month earlier when McDonough was first appointed.

Petitioner seizes on the first falsehood to claim that he never knew McDonough's representation of Fernando Romano continued after McDonough had undertaken representation of Petitioner.  Petitioner claims if he had known, he would have changed counsel.  In making that claim, Petitioner conveniently ignores the second aspect of the falsehood—that McDonough reported the conflict—for the second time—in Petitioner's presence at the preliminary examination.  If Petitioner was so concerned about the conflict that he wanted new counsel, he could have raised the issue then, just as he now claims he would have done if he had only known.

The remainder of McDonough's statements are accurate.  He did not undertake representation of Petitioner in the circuit court prosecution until September 14, 2009, the day he ended his representation of Fernando Romano.  Petitioner acknowledges that he was willing to waive any conflict after the representation ended, so McDonough's entire representation of Petitioner at the Calhoun County Circuit Court was, by Petitioner's own words, unobjectionable. That conclusion was echoed by the trial court when it concluded "[t]here in fact was no conflict necessitating the trial attorney to withdraw from his representation of Mr. Palmer." (Calhoun Cty. Cir. Ct. Order, ECF No. 33-21, PageID.2009.)

The Sixth Amendment right to counsel includes a "correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). The Supreme Court has recognized a slightly different standard in some conflict of interest cases. Specifically, the claimant must show that counsel had a conflict of interest and that the conflict affected his performance. *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002) ("An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance."); *McFarland v. Yukins*, 356 F.3d 688, 705 (6th Cir. 2004) (requiring both "'actual conflict' and 'effect on representation'" (quoting *Thomas v. Foltz*, 818 F.2d 476, 481–82 (6th Cir. 1987)). "[T]he possibility of conflict is insufficient to impugn a criminal conviction." *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980).

Although the Supreme Court has employed the *Sullivan* standard in multiple concurrent representation cases, in successive representation cases, the *Strickland* standard applies. *Stewart v. Wolfenbarger*, 468 F.3d 338, 350-351 (6th Cir. 2006).  No matter which standard the Court applies here, Petitioner has failed to support his claim.  To show that counsel was affected by an actual conflict, Petitioner must show that counsel "'made a choice between possible alternative course of action . . . helpful to one client but harmful to the other.'"  *McFarland*, 356 F.3d at 705.  Petitioner has not identified any such choice here.  Indeed, Petitioner has not offered any evidence, much less clear and convincing evidence, to overcome the trial court's presumptively correct determination that there was no conflict.

Petitioner's claim, not surprisingly, fares no better under the stricter prejudice standard of *Strickland*.  Petitioner cannot show the trial outcome was rendered unreliable by the conflict because at the time of trial, any possible conflict was in the past.  With full knowledge that counsel had previously represented Fernando Romano, Petitioner consented to go forward.

53

Moreover, his present claim—that he would have changed attorneys if he had only known the representations overlapped—is proven false by the preliminary examination transcript which demonstrates that he knew the representations overlapped but did nothing to change attorneys. Petitioner's ineffective assistance claim based on his counsel's conflict of interest is wholly without merit.  The trial court's decision rejecting the claim is not contrary to, or an unreasonable application of, clearly established federal law.

### B.     Appellate Counsel

An appellant has no constitutional right to have every non-frivolous issue raised on appeal.  "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)).  To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688.  As the Supreme Court recently has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2000).  In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.*  Where a claim lacks merit, appellate counsel is not ineffective in declining to raise the issue on direct appeal. *See Moore v. Mitchell,* 708 F.3d 760, 776 (6th Cir. Feb. 26, 2013) ("[A] petitioner cannot show that appellate counsel was ineffective for failing to raise a claim on appeal if the underlying claim itself lacks merit."); *Burton v. Renico,* 391 F.3d 764, 781-82 (6th Cir. 2004) (where claim of

prosecutorial misconduct lacks merit, counsel is not ineffective in declining to raise issue on appeal).

Petitioner claims that his appellate counsel was ineffective for failing to raise this issues Petitioner raised in his first motion for relief from judgment, Habeas Issues III-VIII.  To the extent those issues depend on state law, the trial court determined they were meritless.  Moreover, as a matter of federal constitutional law, as set forth fully above, this Court has determined the issues are without merit as well.   "Omitting meritless arguments is neither professionally unreasonable nor prejudicial."  *Coley*, 706 F.3d at  752.

Under the circumstances, the trial court's determination that appellate counsel's representation was not constitutionally deficient is not contrary to, or an unreasonable application of, *Strickland*.  Accordingly, Petitioner is not entitled to habeas relief on any of this ineffective assistance of counsel claims.

## Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467.  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467.  Consequently, I have examined each of Petitioner's claims under the *Slack* standard.  Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would

find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

I find that reasonable jurists could not conclude that this Court's denial of Petitioner's claims would be debatable or wrong. Therefore, I recommend that the Court deny Petitioner a certificate of appealability.

## **Recommended Disposition**

For the foregoing reasons, I recommend that the habeas corpus petition be denied. I further recommend that a certificate of appealability be denied.

Dated: October 29, 2018                  /s/ Ellen S. Carmody
                                        ELLEN S. CARMODY
                                        U.S. Magistrate Judge

## **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).